UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| TIMOTHY BRIDGES, | ) | Civil Action No.: 4:12-cv-2864-MGL-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| MOHAWK ESV, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

In this action, Plaintiff alleges claims of race discrimination and retaliation[1] in violation of

Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq.  Presently before

the Court is Defendant's Motion for Summary Judgment (Document # 35).  All pretrial proceedings

in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A)

and (B) and Local Rule 73.02(B)(2)(g), DSC.  Because this is a dispositive motion, this Report and

Recommendation is entered for review by the district judge.

## II.    FACTS

Defendant Mohawk ESV, Inc. (Mohawk) manufactures carpet and other flooring products.

Roberts Aff. ¶ 2 (Ex. to Def. Motion).  Plaintiff began his employment on December 15, 1991, and

---

[1]In his Response, Plaintiff does not address Defendant's argument regarding his claim for retaliation.  Thus, it appears he has abandoned this claim.  However, even if he has not, it is undisputed that Plaintiff's termination in 2011 came at least four years after his only alleged complaint of discrimination made sometime between 2005 and 2007.  Pl. Dep. 104, 106.  Such a lengthy period of time negates any possible causal connection between his purported protected activity and the adverse action.  See, e.g., Clark County Sch. Dist. v. Breeden, 532 U.S. 268 (2001) (20-month period between adverse action and protected activity insufficient to show causality).  Thus, summary judgment is appropriate on Plaintiff's retaliation claim.

was employed at Mohawk's Oak River North Yarn facility in Bennettsville, South Carolina. Pl. Dep. 34-35. Plaintiff was employed as a Preventative Maintenance Technician working 7:00 a.m. to 3:00 p.m. on weekdays, although he occasionally filled in on other shifts and in other positions. Pl. Dep. 44-45, 48-50.

On the evening of August 19, 2011, two Mohawk employees, Ray McClellan and Dontae Davis, were involved in a verbal altercation at the plant. Pl. Dep. 107-108; Roberts Aff. ¶ 5. After the argument, McClellan left the building, went out to his car, and returned with a loaded gun. Roberts Aff. ¶ 5. McClellan found Davis in the bathroom and shot him. Pl. Dep. 112; Roberts Aff. ¶ 5. As McClellan fled the plant, Mohawk personnel summoned medical assistance and law enforcement authorities. Roberts Aff. ¶ 5. Davis did not survive.[2] Roberts Aff. ¶ 5.

The night of the shooting, Mohawk and law enforcement began an investigation into the events of that evening. Roberts Aff. ¶ 6. That night, managers brought all of the employees present at the plant together and advised them that the police wanted to interview anyone who knew "why this incident occurred or anything about the situation" as soon as possible. Pl. Dep. 128; Roberts Aff. ¶ 6. Plaintiff did not volunteer as having any knowledge about what happened between McClellan and Davis. Pl. Dep. 128-129. All of the employees who had any information were interviewed by law enforcement that night. Roberts Aff. ¶ 6. Plaintiff was not one of them.

During the investigation, some employees mentioned that they had observed a verbal altercation between McClellan and Davis that evening and that Plaintiff was also a witness to it.

---

[2]McClellan was prosecuted and pleaded guilty on January 28, 2013, to voluntary manslaughter and possession of a weapon during a violent crime; he was sentenced to 23 years in prison. See Fourth Judicial Circuit Public Index: http://publicindex.sccourts.org/Marlboro/PublicIndex/PISearch.aspx

Roberts Aff. ¶ 6.  After being told about this altercation and Plaintiff's knowledge of it, James Roberts (African American), the Senior Human Resources Manager for the facility, asked Plaintiff if he had any knowledge about what had happened that night.  Pl. Dep. 117; Roberts Aff. ¶ 6.  A dispute of fact exists as to what Plaintiff told Roberts.  Roberts states that Plaintiff responded that he did not know anything. Roberts Aff. ¶ 6.  Plaintiff maintains that he informed Roberts, "I just broke it up." Pl. Dep. 120.[3]  There is no dispute, however, that Plaintiff did not tell Roberts any other  information regarding the incident.  Roberts Aff. ¶ 6.

The next morning, Roberts was outside of the plant when Plaintiff arrived to drop off a co-worker.  Pl. Dep. 118; Roberts Aff. ¶ 7.  Because other employees who had been interviewed had noted Plaintiff's presence during the altercation between McClellan and Davis, Roberts again asked Plaintiff if he knew anything about what happened between McClellan and Davis the night of the shooting.  Pl. Dep. 118-119; Roberts Aff. ¶ 7.  Again, a dispute of fact exists as to what Plaintiff told Roberts.  Plaintiff asserts that he told Roberts "yeah, I broke it up." Pl. Dep. 118-19.  According to Roberts, Plaintiff again denied knowing anything.  Roberts Aff. ¶ 7.

Ray Moss, the Department Manager, also asked Plaintiff what had happened the night of the shooting.  Pl. Dep. 117; Moss Aff. ¶ 3.  Plaintiff asserts the following conversation took place:

> [Moss] asked me, Tim, you worked last night; right? He said, what happened? I said, I don't know. I broke them up, went back to work and the shooting occurred. He said, did you see anything? I said, no. He said, well, I heard one guy was in the bathroom and you – you didn't see nothing? I said, no. I was back on my job. He said, did you see them leave or did you see anything? I said, [Moss], I didn't see anything because I went back to work.

---

[3]Interestingly, at one point during Plaintiff's deposition, when asked if he denied giving false information to Mohawk, he responded, "Yes.  I did not give them any information."  Pl. Dep. 127.

Pl. Dep. 121. According to Moss, Plaintiff denied seeing anything or knowing anything about what happened. Moss Aff. ¶ 3.

As part of the investigation into the shooting, law enforcement and Roberts reviewed footage from security cameras throughout the facility. Roberts Aff. ¶ 8. Upon viewing the video[4], Roberts observed Plaintiff intervening in an altercation between McClellan and Davis minutes before the shooting. Roberts Aff. ¶ 8. Plaintiff spent about thirty seconds speaking to the two until McClellan and Davis separated. Bridges Dep. 161-62; Roberts Aff. ¶ 8. Roberts also learned that McClellan walked right by Plaintiff with a bag in his hand when he returned to the facility five minutes before the shooting. Roberts Aff. ¶ 13.

In addition to revealing facts regarding Plaintiff's knowledge of and participation in the events leading to the shooting, the video also revealed that Plaintiff violated two company policies by being away from his work station for two almost-twenty minute breaks within one hour[5] and by leaving the plant during his shift.[6] Roberts Aff. ¶ 8. After observing these violations, Roberts met with Sharon Hepburn (African-American), the shift coordinator to whom Plaintiff reported that night. Roberts Aff. ¶ 14; Hepburn Aff. ¶¶ 3-4; Pl. Dep. 109. Hepburn advised Roberts that Plaintiff did not have permission to take extended breaks and that she had not granted him permission to leave the building. Roberts Aff. ¶ 14; Hepburn Aff. ¶¶ 3-4. Plaintiff asserts that Hepburn gave him

---

[4]The parties have not provided the court with a copy of the video.

[5]For the shift on which he was working, Plaintiff was allowed three fifteen-minute breaks and one twenty-five minute break, which were fairly evenly spaced during his twelve-hour shift. Taking two breaks within the same hour is not permitted. Pl. Dep. 113; Roberts Aff. ¶ 9.

[6]Employees may not leave the facility during their shift unless they have permission from their supervisor. Pl. Dep. 40; Roberts Aff. ¶ 10.

permission to go outside of the plant to use his cell phone, but admits that he did not use his cell phone and, instead, stood outside with co-workers discussing the "beef" between McClellan and Davis.  Pl. Dep. 115.

As a result of this investigation, Jamie Haselden (white), the Plant Manager, Roberts, and Moss made the decision to suspend and then terminate Plaintiff's employment.  Defendant asserts that Plaintiff was terminated for not being truthful during the serious investigation of a workplace shooting.  Haselden Dep. 54-55; Roberts Aff. ¶ 15.

Bridges filed a charge with the United States Equal Employment Opportunity Commission ("EEOC") on or about November 23, 2011.  Pl. Dep. 144 and Ex 8.  He alleged that he experienced racial discrimination from September 8, 2011 until September 14, 2011 (the time between suspension and termination).  Pl. Dep. 144 and Ex. 8.  Plaintiff raises no other allegation in his charge other than he was terminated because of his race.

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial.  Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party

must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.     DISCUSSION

Plaintiff alleges that Defendant terminated him because of his race. Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1). Plaintiff has not produced direct evidence of race

-6-

discrimination and, thus, must proceed under the burden-shifting proof scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this burden-shifting scheme, Plaintiff has the initial burden of establishing a prima facie case of discrimination. Id. To establish a prima facie case of race discrimination in a termination case, the plaintiff must present facts showing that (1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) similarly-situated employees outside the protected class received more favorable treatment. White v. BFI Waste Services, LLC, 375 F.3d 288, 295 (4th Cir. 2004). The fourth element can also be met by showing other circumstances giving rise to a reasonable inference of unlawful discrimination. Miles v. Dell, Inc., 429 F.3d 480, 486-87 (4th Cir.2005).

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the disparate treatment. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). This is merely a burden of production, not of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reasons, but was pretext for discrimination. Reeves, 530 U.S. at 143. Throughout the burden shifting scheme set forth in McDonnell Douglas, the ultimate burden of proving that Defendant

intentionally discriminated against Plaintiff remains at all times with Plaintiff. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude defendant intentionally discriminated against him.

It is undisputed that Plaintiff is a member of a protected class and that he suffered an adverse employment action when he was terminated. Defendant argues, however, that Plaintiff was not performing his job duties satisfactorily because he was untruthful during a serious investigation. Defendant argues that, although an issue of fact exists whether Plaintiff told Roberts he did not know anything about the altercation or whether he told him "I just broke it up," it is undisputed that Plaintiff withheld vital information regarding his knowledge about the altercation, including that the altercation between McClellan and Davis was just minutes before the shooting, what the altercation was about, what McClellan and Davis said during the altercation, and that McClellan returned to the building five minutes before the shooting carrying a bag.

In his Response, Plaintiff does not argue that he did not withhold information from Roberts and Moss regarding his knowledge of the altercation between McClellan and Davis, nor does he dispute that he took two breaks within one hour and left the plant during his shift. Rather, he argues that white employees engaged in the same or similar conduct but were not terminated. To be similarly situated, a "plaintiff must establish that 'other employees' were similarly situated in all relevant respects; that they 'dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" See Ward v. City of North Myrtle Beach, 457 F.Supp.2d 625, 643 (D.S.C.2006). Although Plaintiff need not establish exact similarity, see Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir.1993), "[t]he similarity between comparators and

the seriousness of their respective offenses must be clearly established in order to be meaningful." Lightner v. City of Wilmington, 545 F.3d 260, 265 (4th Cir.2008).

Plaintiff points to several white employees he argues received more favorable treatment for similar conduct:

T.P., a Caucasian maintenance tech, was counseled for using the word "clan," and was given a corrective action slip that was reduced by Jamie Haselden to a "strong verbal warning" when he learned that she used the word to refer to her group of friends rather than the Ku Klux Klan. T.P. Incident Report (Ex. D to Pl. Response); Haselden Dep. 100-01.

T.S., a Caucasian maintenance technician, was discharged by Jamie Haselden and James Roberts in 2006, after receiving 4 corrective actions for attendance within a year. T.S. Personnel Change Form (Ex. E to Pl. Response); Roberts Second Aff. ¶ 5 (Ex. to Def. Reply).

I.E., a Caucasian twister operator, was also discharged after receiving 4 corrective actions within a year; three for attendance and one for performance. I.E. Personnel Documents, p.1 (Ex. F to Pl. Response); Roberts Second Aff. ¶ 6.

S.B., a Caucasian employee in Cable Twisting Department was given a written warning for violating safety rules by cutting towards himself with a knife. S.B. Incident Report (Ex. H to Pl. Response).

J.L., a Caucasian maintenance technician, was not reprimanded for failing to clock out when leaving the campus, although he was reminded to do so in the future.[7] J.L. Record of Conversation (Ex. I to Pl. Response).

---

[7]As a lead maintenance employee, J.L. went to lunch with sales people to talk about and order parts and there is no evidence that he was previously informed that he should not be compensated for those meetings. Lane Dep. 30-31.

Tammy Patterson, a Caucasian maintenance technician was written up for leaving the North Plant and going to the South Plant and staying too long. Haselden testified, however, that once he investigated the situation, he determined that she had not been at the South Plaint for too long. Lane Dep. 19 (Ex. M to Pl. Response); Haselden Dep. 59-61 (Ex. N to Pl. Response).

Plaintiff also points to two individuals shown on the surveillance video, Kevin Bethea and Otis Jenkins. Plaintiff asserts that the video shows that Bethea was away from his job area and that Otis Jenkins "may also have been breaking up the argument." Plaintiff asserts that Jenkins did not give a statement nor was he terminated. Plaintiff provides no evidence to support these contentions. Defendant notes that both Bethea and Jenkins are African-American; thus, these employees are not proper comparators because they are not outside of Plaintiff's protected class.

Plaintiff fails to show that the seriousness of these employees' offenses is comparable to Plaintiff's offense. Defendant's Corrective Action Policy provides that minor infractions are handled with corrective actions and that receipt of four corrective actions during a one-year period may result in an employee's termination. Roberts Second Aff. ¶ 3; Corrective Action Policy p. 3 (Ex. 1 to Roberts Second Aff.). Employees who commit "intolerable," or major, policy violations, on the other hand, may be discharged immediately without prior warnings. Roberts Second Aff. ¶ 3; Corrective Action Policy p. 3. Defendant's policy does not specifically address being untruthful or withholding known information in an investigation. However, Roberts and Haselden both testify that Defendant considers not being truthful during an investigation an intolerable offense that can lead to immediate discharge. Roberts Second Aff. ¶ 3; Haselden Dep. 54. Further, Plaintiff admits that giving false information during a serious investigation would justify discharge. Pl. Dep. 127-28. In contrast, the offenses committed by the other employees, such as attendance and performance

-10-

infractions, are considered "counseling offenses," which result in a warning. Corrective Action Policy pp. 3-4. This, as well as the other facts set forth above, clearly show that none of the comparators asserted by Plaintiff engaged in the same or similar conduct and, thus, they are not similarly situated.

For these reasons, Plaintiff fails to present sufficient evidence to show that similarly-situated employees outside the protected class received more favorable treatment. As such, he fails to establish a <u>prima facie</u> case of race discrimination and summary judgment is appropriate.

## V.    CONCLUSION

For the reasons discussed above, it is recommended that Defendant's Motion for Summary Judgment (Document # 35) be granted and this case be dismissed in its entirety.


                                              s/Thomas E. Rogers, III
                                             Thomas E. Rogers, III
                                             United States Magistrate Judge

March 20, 2014
Florence, South Carolina